# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| BRODY KASS, a protected person, ex rel., CHARLES KASS and LISA KASS, his parents and guardians,<br><br>    Plaintiffs,<br><br>vs.<br><br>WESTERN DUBUQUE COMMUNITY SCHOOL DISTRICT and KEYSTONE AREA EDUCATIONAL AGENCY,<br><br>    Defendants. | No.  C21-1013-LTS-KEM<br><br><br>**MEMORANDUM OPINION AND ORDER** |

## I.    INTRODUCTION AND PROCEDURAL HISTORY

This case involves judicial review of a due process administrative decision under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. Plaintiffs Brody Kass and his parents, Charles and Lisa Kass, originally brought a due process complaint before the Iowa Department of Education (IDE) against defendants Western Dubuque Community School District (the District) and Keystone Area Educational Agency (AEA). Plaintiffs argue that the defendants denied Brody a free and appropriate public education (FAPE) under the IDEA. An administrative law judge (ALJ) issued a decision finding that defendants did not deny a FAPE to Brody.

Plaintiffs filed a complaint (Doc. 1) in this court on July 19, 2021. In addition to appealing the ALJs' decision based on the IDEA (Count I), the complaint also asserts claims under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504) (Count II). Doc. 1 at 18. Following submission of the administrative record (Doc. 18), plaintiffs submitted their merits brief (Doc. 23) and a motion (Doc. 24) for leave to supplement the administrative record. Defendants

filed a resistance (Doc. 25) to the motion for leave to supplement and a response (Doc. 30) to plaintiffs' merits brief. Plaintiffs filed a reply (Doc. 36) in support of their merits brief.

On May 16, 2022, United States Magistrate Judge Kelly K.E. Mahoney denied plaintiffs' motion for leave to file a supplement to the administrative record. *See* Doc. 33. Plaintiffs have filed an appeal (Doc. 38) of that decision. I find oral argument is not necessary. *See* Local Rule 7(c). I will address plaintiffs' appeal and the merits of their complaint in this order.

## II. FACTUAL BACKGROUND

Brody is 20 years old. He has severely impaired vision, moderate intellectual disability, intractable epilepsy, autism spectrum disorder, attention-deficit/hyperactivity disorder and a brain injury resulting from a lesion on his brain. Brody has received special education through an individualized education program (IEP) since preschool. He was enrolled in Western Dubuque Community Schools from kindergarten to the middle of fifth grade. He then switched to the Hillcrest Lawther Academy until halfway through ninth grade, at which point he returned to the District and enrolled at Western Dubuque High School on January 3, 2017. In 2019, Brody completed the eleventh grade. He attended twelfth grade until school was suspended in March 2020 due to the COVID-19 pandemic. He continues his education pursuant to Iowa Code § 256B.2 (allowing children with special education to continue education until the end of the school year in which the student turns twenty-one).

Plaintiffs allege defendants have refused to provide Brody with a FAPE under the IDEA by:

- Not providing him with reading instruction specially designed to meet his unique educational needs with measurable annual reading goals;
- Limiting him to less than half of a regular school day; and

2

- Not providing the transition services required by IDEA and necessary for him to transition from secondary school to adult life.

Plaintiffs filed their administrative due process complaint on August 21, 2020, and invoked Brody's "stay put" rights.[1]  The due process hearing took place on October 26 and 27, 2020.  Plaintiffs were represented by an attorney and presented testimony from Jennifer Denne (the alternate assessment consultant with the IDE), Lisa Kass (Brody's mother, guardian and conservator and a Title 1 reading teacher for kindergarten through twelfth grade students), Dr. Christopher Lemons (expert witness in reading for children with learning and intellectual disabilities), Jamie Phipps (vocational rehabilitation counselor with the Iowa Department for the Blind), Tina Rice (supported community living (SCL) coach), Tracy Grimes (literary consultant for the AEA) and  Nancy Millice (educational consultant in psychiatry).

Defendants presented testimony from Vicky Coyle (director of special education and at-risk coordinator for the District), Linda Johanns (special education teacher for the District), Lee Johnson (a strategist teacher leader for the District), Jill Hageman (school social worker for the AEA) and Shelley Schafer (school psychologist with the AEA). The ALJ admitted plaintiffs' exhibits B, C, E, F1, G1-G59, H through O and Q through R.  He also admitted defendants' exhibits 1 through 52 except for exhibit 16.  After the parties submitted post-hearing briefs, *see* Doc. 18-4 at 315-42; 343-72, the ALJ issued his decision on April 20, 2021, concluding that Brody had not been denied a FAPE.  Doc. 18-15 at 248-69.

Plaintiffs' complaint concerns the IEPs for the 2018-2019 and the 2019-2020 school years – Brody's junior and senior years.  They also challenge the May 2020 IEP for the 2020-2021 school year.  Plaintiffs challenge the reading goals and methods of

---

[1] The "stay put" provision of the IDEA requires that a child remain in the then-current educational placement during the pendency of a due process proceeding.  *See* 20 U.S.C. § 1415(j).

instruction for his junior and senior years and, for the May 2020 IEP, they assert: (1) a procedural violation because the District drafted the IEP before the IEP team completed a substantive review and received results of pending evaluations, (2) denial of a FAPE based on the alleged lack of a "coordinated set of activities within a result-oriented process to facilitate his transition from school to post-school activities" and reduction in his school hours. My discussion of the IEPs within those years will focus on those topics.

The August 2018 IEP (Doc. 18-2 at 14-70) indicates Brody had completed 19 of the 58 credits required for graduation. Doc. 18-2 at 19. With regard to his reading goals, he was utilizing the PCI methodology and could recognize 77 out of 140 words. The team set a goal that he would be able to recognize all 140 words by December 2018. He would be assessed on a Comprehensive Word Checklist from the PCI Reading Program at Level 2 every two weeks. *Id.* at 23, 63. There are no notations of requests by Brody's parents to utilize a different reading program. *Id.* at 71.

The IEP team discussed how to change goals to better prepare Brody for more functional, real life, transitional skills. They also determined that he would attend the Connections (special education) program for reading, writing, math and behavior goals, but would be scheduled in the main building with adult support for vocation skills, physical education (P.E.) and work study. *Id.* Brody's parents agreed to a reevaluation by the AEA to assess Brody's behavior. *Id.* at 73.

The September 2018 IEP reflects that Brody's mother had no concerns at the time. Doc. 18-4 at 550. His reading goal and progress remained the same as the August 2018 IEP. *Id.* at 558. The only discussion regarding his reading goal was that teachers would request story box books from the AEA. *Id.* at 585.

The AEA provided its reevaluation report on October 31, 2018. Doc. 18-2 at 252-54. Three different resource teams (autism, brain injury and behavior) provided input. They recommended continuing to integrate Brody into the regular building as much as possible and to align work tasks to goal areas that targeted needed post-secondary transition skills. *Id.* at 252. They also recommended setting goals that targeted literacy

4

and math deficits as they related to his post-secondary needs in the areas of living, learning and working. *Id.* Finally, the AEA team recommended incorporating employability skills into his literacy and math goals. *Id.* at 253.

The October 2018 IEP indicates that Brody's mother had no concerns at the time. Doc. 18-5 at 36. The team discussed Brody's post-secondary strengths, needs and wishes. *Id.* at 39. Brody's reading goal and progress remained the same as the August 2018 IEP. *Id.* at 44.

The November 2018 IEP noted that Brody had completed 37 of the 58 credits required for graduation. Doc. 18-5 at 111-12. Based on the AEA report, this IEP included an employability goal. *Id.* at 113. The IEP team also changed his math and reading goals based on the rubric suggested by the AEA teams to be based on Brody's actions and observation of skills within a vocational, project-based learning setting. *Id.* at 115-16. His reading goal would now be based on rubric standards for literacy. He currently scored 6 percent (1 out of 16) on rubric standards. *Id.* at 115.

The February 2019 IEP indicates the parents did not have any concerns at the time. *Id.* at 175. His goals and progress remained the same. *Id.* at 180-83. The September 2019 IEP again reflects the parents did not have any concerns at the time. *Id.* at 227. Brody had completed 37 of the 58 credits required for graduation. *Id.* at 230-31. In reading, he scored 6 percent (1 out of 16) on rubric standards for literacy-based instruction. *Id.* at 234. The team discussed Brody going to a job site with other peers and his job coach. He was doing well with his work experience placement at Theisen's. *Id.* at 256. Brody's mother agreed he should continue his work at Theisen's because it would not require a change in his current class schedule. *Id.* at 257. With regard to reading, his teachers were currently assessing his level using Next Step Guided Reading. The notes also indicate that phonics work was being instructed and teachers were utilizing the Start to Finish Program as well. There are no comments from the parents about specific reading curriculum requests. *Id.* The IEP noted that the team would discuss transition needs at the next meeting in October. *Id.* at 258.

5

The October 2019 IEP reflects that Brody had completed 54 of the 58 credits required for graduation, needing one science credit, one social studies credit and two electives to graduate. *Id.* at 302-03. With regard to his reading goal, he had mastered 19 out of 50 skills and scored 7 out of 16 on rubric standards. *Id.* at 306. At the October 2019 IEP team meeting, the team discussed graduation and post-secondary services for Brody. *Id.* at 328. If Brody needed to come back to school next fall to work on transition goals it would not be for a full day but could be for a specified amount of time until his goals were met. *Id.* at 328.

The March 2020 IEP indicates that the IEP team met in January 2020 and February 2020 to discuss the 2020-2021 school year and Brody's transition needs. *Id.* at 390-91. The parents' concerns included what special education to age 21 entailed and what options were available for Brody after he graduated. *Id.* at 360. The notes indicate that Next Step Guided Reading began on December 2, 2019. Brody was maintaining what he had learned but not progressing enough to meet the progression rate. *Id.* With regard to graduation and additional services, the team agreed that Brody had unmet needs and would continue education into the 2020-2021 school year. *Id.; see also id.* at 414 (prior written notice for March 2020 reflecting information from the January IEP meeting).

On February 14, 2020, Coyle sent Brody's parents and lawyer a draft of considerations for the 2020-2021 school year. Doc. 18-4 at 425. The draft addressed specially designed instruction (SDI) in the areas of reading, math, transition and behavior skills with a focus on functional skills. It also included the following proposed schedule:

8:00-10:00: SDI

10:00-10:15: Transportation to Theisen's

10:15-12:15: Work

12:15-12:45: Lunch (Day Hab/Day Care or other options for lunch)

12:45-1:00: Transportation to Day Hab/Day Care

1:00-4:00: Day Hab/Day Care

4:00: Transportation home (provided by Day Hab/Care)

6

*Id.* at 426.

The IEP team had a meeting scheduled for March 12, 2020, to finalize Brody's services for the next year but the family requested a reevaluation prior to the meeting. Doc. 18-5 at 391. The District agreed to the reevaluation and to reconvene after it had been completed. The reevaluation, conducted by the AEA, included the following recommendation with regard to English language arts:

> A shift in focus from isolated literacy skills (phonics, decoding, sight words, vocabulary) to embedding these skills into opportunities that Brody will encounter every day. When on the job site, when out in the community or with family, embedding literacy into his routines, this could be done by the special education teacher and/or through accessing post secondary service providers (IVRS, SCL, LTSS, etc.) Brody needs adult guidance and support to use those skills he has gained and/or tools he has access to and transfer them into his day to day activities outside the school setting.

Doc. 18-2 at 289. As for math, the reevaluation recommended:

> Similar to the Language Arts recommendations, the team recommends shifting away from isolated skill instruction in basic addition and subtraction for Brody and instead, should focus on functional math skills; embedding these skills into opportunities that Brody will encounter every day. When on the job site, when out in the community or with family, embedding mathematics into his routines could be done by a special education teacher and/or through accessing post secondary service providers (IVRS, SCL, LTSS, etc.). Brody needs adult guidance and support to use those skills and tools he has been introduced to (examples include: using a calculator, using a checkbook/checking account, basic money, and concepts of time) to be utilized during his post secondary experiences. Relating all of these skills to real life will allow him to generalize those skills into his daily activities. This should be provided outside of the school building and into Brody's community interactions.

*Id.* at 292. The reevaluation team recommended that an adaptive behavior goal be considered for education beyond Brody's senior year. *Id.* at 293. They also relied on information provided by Phipps at the February 2020 IEP meeting with regard to vocational recommendations. *Id.* at 294. It concluded that no academic goals were

7

recommended at the time and recommended the IEP gradually transition Brody to more natural experiences in the community. *Id.* at 312.

The March 2020 IEP indicates that Brody had met 12 out of 16 rubric standards under the IEP reading goal. Doc. 18-5 at 377. The IEP team met again in May and June 2020 to review the AEA reevaluation report. Coyle emailed the parents and their lawyer drafts of considerations for the 2020-2021 school year. These included SDI at 600 minutes per week in a one-on-one setting to provide intensive individualized instruction designed to address adaptive behavior and employability goals. Doc. 18-4 at 428. It also included the previously-discussed schedule.

On July 15, 2020, Coyle sent Brody's parents and lawyer the May 2020 IEP and Prior Written Notice (PWN), noting they had provided a draft IEP on July 6, 2020. Doc. 18-1 at 589. The email stated: "This is what we intend to have in place at the start of the school year unless you request a meeting prior to this." *Id.* The May 2020 IEP reflects that Brody's parents identified the following areas of concern: behavior, job training, lunch, math, personal management, physical education, reading, safety/health education, sex education, social skills and writing. They wanted to see the development of transition services, instruction in phonological awareness and understanding of phonics in reading. *Id.* at 544. They also requested an Independent Educational Evaluation (IEE). Finally, they requested social skill instruction and a functional employment evaluation to identify the type of work Brody would be best at along with the training and accommodations he would need in order to do that work. *Id.*

The IEP stated that Brody would not be in general education classes for the 2020-2021 school year because he had completed the course requirements for graduation. *Id.* at 548. He had areas of need in adaptive behavior and employability and would receive SDI in these areas. *Id.* at 548-49. It also stated his unmet transitional needs would be best met through real life experiences using functional literacy and functional math resources in school and in post-secondary environments. *Id.* It included the following schedule:

8:00 – 10:00 a.m. – SDI at school or in the community

10:00 – 10:15 a.m. – Travel to work at Theisen's

10:15 – 11:15 a.m. – Work with job coach from school at job site

11:15 a.m. – Transportation provided by school to home/day hab/day care

*Id.* at 565.

The PWN reflects that Brody had met the credit requirements for graduation but the IEP team determined he had unmet needs in the areas of adaptive behavior and employability to help prepare him for post-secondary expectations and that he would be provided SDI in these areas. It noted that the parents requested an IEE and the team was working to arrange that. *Id.* at 590. The requests from Brody's parents that he receive instruction in core academics in the areas of reading, writing and math was rejected by the school team because the team believed focusing on functional skills for Brody in the community setting was more appropriate. They also rejected the request that Brody participate in art, P.E., sex education and lunch at the school because Brody had already taken the courses necessary for graduation and Brody's peers had graduated. *Id.* at 591.

Plaintiffs did not request a meeting regarding the May 2020 IEP. Instead, they filed their due process complaint on August 21, 2020, the Friday before the start of the school year. As such, this IEP was never implemented based on the stay put provision of the IDEA.

### III.  *APPLICABLE STANDARDS*

Under the IDEA, parents may file a due process complaint to challenge "the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Complaints are resolved by a due process hearing conducted by the state or local educational agency or, if desired by the interested parties, voluntary mediation. *Id.* § 1415(e)–(f). When no procedural violations are alleged, the purpose of the due process hearing is to determine whether the child received a FAPE. *Id.* § 1415(f)(3)(E)(i). Procedural violations may

9

also result in the denial of FAPE if the procedural inadequacies: (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of educational benefit. 20 U.S.C. § 1415(f)(3)(E)(ii). The burden of proof falls on the party seeking relief. *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015).

A party may seek review of the administrative proceedings by bringing a civil action in state or federal court. *Id.* § 1415(g), (i)(2). A federal district court reviewing an agency decision under the IDEA must conduct a de novo review to determine whether the aggrieved party is entitled to relief based on a preponderance of the evidence. *Id.* § 1415(i)(2)(C)(iii); *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Sch.*, 863 F.3d 966, 970 (8th Cir. 2017). However, the court must give "'due weight' to the outcome of the administrative proceedings." *Id.* (quoting *T.F. v. Special Sch. Dist. of St. Louis Cty.*, 449 F.3d 816, 818 (8th Cir. 2006)).

## IV.   ANALYSIS

Plaintiffs allege defendants violated the IDEA and denied Brody a FAPE by:

- refusing to provide Brody with appropriate reading instruction
- violating their procedural rights by writing the May 2020 IEP before the IEP team completed a substantive review that it concluded was necessary to write the IEP and without waiting on results of pending evaluations
- failing to provide, as part of Brody's transition services, a coordinated set of activities designed to be a results-oriented process focused on improving Brody's achievement.
- reducing Brody's school day

10

*See* Doc. 1. They allege violations of the IDEA (Count I) as well as the ADA and Section 504 of the Rehabilitation Act (Count II).[2] They seek compensatory education, declaratory relief, damages and attorney fees. *Id.*

I will first address plaintiffs' appeal of Judge Mahoney's decision denying their motion for leave to supplement the record. I will then address plaintiffs' complaints related to Brody's reading instruction as this pertains to the 2018-2019 and 2019-2020 school years. Finally, I will address plaintiffs' complaints related to the 2020-2021 school year concerning the May 2020 IEP, transition services and reduction in school day.

## A.    *Appeal of Magistrate Judge Decision*

Plaintiffs sought leave to supplement the record with the resume of the ALJ who presided over the due process hearing, arguing that it relates to the deference the court should give to the ALJ's decision because his education and experience is as a lawyer rather than an educator. Doc. 24 at 2. Judge Mahoney denied leave to supplement the record, noting that the cases plaintiffs cited do not establish that the weight owed to the administrative proceedings is affected by the hearing officer's background. Doc. 33. She also observed that the IDEA and related regulations establish minimum qualifications for a hearing officer, none of which require a background in education. *Id.*

Plaintiffs appeal this decision arguing the ALJ's resume relates to the deference the court should give to the ALJ's "notions of sound educational policy." Doc. 38-2 at 1. They note that the Supreme Court has stated that "the provision that a reviewing court must base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of the Henrick Hudson Ctr. Sch.*

---

[2] Plaintiffs make only a cursory argument as to Count II. *See* Doc. 23 at 60 ("Section 504 does not permit discrimination against 18 to 21-year-old students because they have met graduation requirements.").

*Dist. v. Rowley*, 458 U.S. 176, 206 (1982).  Plaintiffs contend this principle does not apply when the ALJ's background is as a lawyer.  Doc. 38-4.  They state that at the time *Rowley* was decided, the due process hearing officers in Iowa were all educators, but the IDE has since relied on the Department of Inspections and Appeals to provide ALJs for IDEA due process hearings.  As such, current ALJs may not have a background in education.  Essentially, they contend the "school authorities" referenced in *Rowley* refers to the hearing officer (as an educator) and not a person on the school IEP team.  Plaintiffs state their motion "is not the time for considering the effect of *Rowley*'s statement about trained educators when the hearing officer is a lawyer" and "ask only that record include the proof that the ALJ was a lawyer with no education background."  Doc. 38-2 at 6.  Thus, they request:

> that the Court correct an error by the IDE.  It forgot to attach the ALJ's record either when it issued the notice of his appointment or when it prepared the record submitted.  The qualifications relate to an issue plaintiffs raise in this appeal in either case.  The Court should not decide that issue at this time.  It should grant this motion to avoid a result in which the Court declines to consider plaintiffs' argument about applying the *Rowley* "trained educators" sentence because the record does not indicate the ALJ was a lawyer.

Doc. 38-2 at 6.

Even considering the historical background, the ALJ's experience as a lawyer rather than an educator is not relevant.  As plaintiffs note, the standard of review requires a reviewing court to "independently determine, based on a preponderance of the evidence, and giving 'due weight' to the state administrative proceedings, whether the state has complied with IDEA's requirements."  *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1373 (8th Cir. 1996).  Plaintiffs acknowledge that the "due weight" standard applies regardless of whether the ALJ is a lawyer or an educator.  Doc. 38-2 at 5.  Plaintiffs have cited no authority supporting their argument that *Rowley* should be narrowly interpreted as allowing a different type of deference when the hearing officer is an educator.  Indeed, the Supreme Court's use of the *Rowley* statement in later cases

12

suggests that it interprets the "school authorities" as either the school itself or the school members of an IEP team. *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-02 (2017) ("By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances."); *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 686 (2010) (in a non-IDEA case, stating "[c]ognizant that judges lack the on-the-ground expertise and experience of school administrators, however, we have cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'").

Because the ALJ's professional background is not relevant to the issues before me, or to the standard of review, plaintiffs' appeal (Doc. 38) of Judge Mahoney's ruling denying leave to supplement the record is denied.

**B.      *Reading Instruction in the 2018-2019 and 2019-2020 School Years***

Plaintiffs allege the District did not establish reading goals that met Brody's educational needs and that its methods of instruction were not reasonably calculated to enable him to learn to read. The ALJ rejected plaintiffs' argument that the District's methodology was inappropriate and that "systematic and explicit" instruction was required to provide FAPE. Doc. 18-15 at 261. Plaintiffs' expert, Dr. Lemons, testified that neither PCI nor Next Step, the reading methodologies used by the District, were based on the science of reading. *Id.* Specifically, Dr. Lemons found PCI inappropriate because it focused only on sight words and found Next Step inappropriate because there was little research behind it. *Id.* at 261-62. He identified products using systematic and

explicit instruction including Orton-Gillingham, Barton and Wilson as being more appropriate.

Coyle testified that the District switched to Next Step after Brody was not making as much progress as they hoped in PCI and because it allowed for individualization of instruction. *Id.* at 262. The ALJ noted the IDEA did not require an IEP to include a specific instructional methodology unless the IEP team determined a specific methodology was necessary to provide FAPE. *Id.* (citing 71 C.F.R. § 46665). He reasoned:

> Complainants did make a valid case that a reading product such as Orton-Gillingham or Barton would have been a good choice for this student, perhaps even a better choice than the products the District elected to employ. However, that is not the question here. The question here is whether the District's choices provided the student FAPE. As has been made clear many times over, the IDEA does not require a school district to provide a special education student with *the best* education or services available; rather it must provide an educational benefit in light of the child's unique circumstances.

> Here, the IEP team found that over the years PCI and Next Step were appropriate for the student given his unique needs. The record here shows that during the 2018-2019 school year, the student did make progress in his reading instruction, moving from a baseline of 6% to 31%. Then, during the 2019-2020 school year, while using Next Steps and after his reading SDI was increased to 60 minutes per day early in the year, progress was also demonstrated, moving from a baseline of seven standards mastered to twelve standards mastered out of 16 possible. This progress is not insignificant, especially given the student's unique situation, abilities, and needs. But, it is consistent with the Student's abilities, conditions, level of cognitive functioning, and prospect for progress.

> It is clear that a district may use any educational methodology that allows a student with a disability to make progress consistent with the standard expressed in *Endrew F*. Neither the parents' preference for a different methodology nor evidence that the student would make greater progress with a different technique will make the District's program inadequate. Complainants argue the student could only make educational progress via a systematic and explicit instruction methodology such as

14

Barton or Orton-Gillingham. However, the District's witnesses each testified credibly that PCI and Next Step were appropriate educational methods for the student and did allow him to make some progress. The District is entitled to deference on the issue of educational methodology. *Rowley*, 458 U.S. at 207.

Although the parents here may desire a different, specific methodology, and may have experts who would recommend it for the student, the bottom line is whether the student's program is designed to confer an educational benefit in light of the student's unique circumstances. The IEP team here had no duty to include the parents' preferred reading methodology in the student's IEP. The program the District employed addressed the student's needs and was calculated to prove a FAPE. This result is consistent with the IDEA's preference to defer to a district's choice of appropriate educational methodologies.

*Id.* at 262-63 (emphasis in original).

Plaintiffs note that on June 17, 2020, Iowa adopted the science of reading as the required method for teaching students with dyslexia. Doc. 23 at 30 (citing 202 Iowa Legis. Serv. Ch. 1048 (S.F. 2356)). They do not claim that the State of Iowa required the District to use the science of reading to instruct Brody, *see* Doc. 36 at 13, but argue this supports Dr. Lemons' conclusion that it is the appropriate instruction for Brody and demonstrates that Iowa public policy values the science of reading. Plaintiffs also focus on Millice's testimony that Brody had room to improve his reading and that he needs a very basic hands-on approach to his learning, which plaintiffs assert is an Orton-Gillingham-type program. *Id.* at 31.

With regard to any deference that should be provided to a District's choice of education methodology, plaintiffs argue the ALJ did not make a finding of fact as to whether the District's reading methodologies were appropriate for Brody and should have made such a finding given the conflicting testimony. They take issue with the ALJ's use of the word "disinclined" when he stated that "[c]ourts should be disinclined to overturn a district's choice of appropriate educational theories." *Id.* at 33. They argue the ALJ took *Rowley*'s cautionary statement and turned it into an irrebuttable presumption that

15

deference should be given to a school district's choice of methodology that it considers appropriate. Plaintiffs contend the record supports Dr. Lemons' conclusions that PCI and Next Step were not appropriate for Brody. They add that the IEP team never concluded that PCI and Next Step were appropriate and that no data supports a conclusion that Brody's progress in learning to read was consistent with his abilities, conditions, level of cognitive function and prospect for progress. They argue the preponderance of the evidence shows the District's reading methodologies were inadequate and that the goals, SDI and methodology were inconsistent with the standard expressed in *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017).

Plaintiffs' arguments on this issue turn on the appropriate standard of review. They contend the ALJ gave defendants too much deference and that the ALJ was required to make certain findings of fact regarding which reading methodologies were appropriate based on the record. The ALJ relied on both *Rowley* and *Endrew F.* in his decision. In *Rowley*, the parents of a deaf student requested that she be provided a qualified sign-language interpreter in all her academic classes in lieu of other assistance proposed in the IEP. *Rowley*, 458 U.S. at 184. An interpreter had previously been placed in the student's kindergarten class and reported that the student did not need his services at that time. After consulting with the school district's Committee on the Handicapped, the school determined that the student likewise did not need an interpreter in her first-grade classroom. *Id.* at 185. When the parents' request was denied, they requested a hearing before an independent examiner. The examiner agreed with the school and the New York Commissioner of Education affirmed based on substantial evidence in the record. *Id.* The parents then sought judicial review in federal district court. The court determined the student was not receiving a FAPE, which it defined as "an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children." *Id.* at 186. The Second Circuit Court of Appeals affirmed and the Supreme Court granted certiorari to consider the intended meaning of FAPE and the role of state and federal courts in exercising review pursuant to 20 U.S.C. § 1415.

16

The Court started with the statutory[3] definition of FAPE, and the definitions within, to conclude it consists of "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Id.* at 188-89. It noted the statutory language lacked any substantive standard prescribing the level of education. *Id.* at 189. In examining the legislative history, it found that Congress' primary goal was to make public education available to children with disabilities, not to impose any greater substantive educational standards than would be necessary to make such access meaningful. *Id.* at 192 ("Thus the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside"). The Court determined that the lower courts erred in holding that the Act required the state to maximize the potential of each child with a disability commensurate with the opportunity provided to children without disabilities. *Id.* at 200-01 ("We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."). It held that a state satisfies the FAPE requirement "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203.

With regard to judicial review, the Court noted the EHA provides that a court "shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* at 205 (quoting 20 U.S.C. § 1415(e)(2)). Because the reviewing court must receive the record of the administrative proceedings, the Court stated it was an implied requirement that

---

[3] *Rowley* involved the Education of the Handicapped Act (EHA), which was later amended and renamed the IDEA in 1990. *See* Pub. L. 101-476, § 901(a), 104 Stat. 1141.

"due weight" be given to these proceedings. *Id.* at 206. It outlined a twofold inquiry for courts to consider: (1) whether the state complied with the procedures set forth in the EHA and (2) whether the IEP developed through the EHA's procedures was reasonably calculated to enable the child to receive educational benefits. *Id.* at 206-07. If these requirements are met, the state has complied with its obligations under the EHA.

The Court cautioned that courts should not impose their view of preferable methods upon the states because the "primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [EHA] to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* at 207. It stated that "once a court determines that the requirements of the [EHA] have been met, questions of methodology are for resolution by the States." *Id.* at 208. It noted that children were protected by the requirement of parental involvement in the development of the IEP and that states would receive the advice of experts as a condition of receiving federal funding. *Id.* at 208-09, n.31. The Court concluded that the student was receiving personalized instruction and related services calculated by the school to meet her educational needs. *Id.* at 210.

In *Endrew F.*, the Court addressed the issue of what constitutes sufficient educational benefits under the IDEA. The Court discussed *Rowley*, noting that it rejected an "equal opportunity" standard and also rejected the argument that there was no substantive requirement at all. *Endrew F.*, 137 S. Ct. at 995. It described its "middle path" approach as finding that a child has received a FAPE if the child's IEP "sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* Endrew had been diagnosed with autism at age two and was entitled to benefits under the IDEA. By fourth grade, his parents felt that his academic and functional progress had stalled and enrolled him in a private school specializing in educating children with autism. *Id.* at 996. His parents met with the public school district the next fall and the school district presented a new IEP. The parents felt that the plan

18

offered no meaningful difference from the previous IEP, despite the fact that his experience at the private school suggested he would benefit from a different approach. They filed a complaint with the Colorado Department of Education seeking reimbursement for Endrew's private school tuition. *Id.* at 997. The ALJ ruled in favor of the school district and the federal district court agreed. The Tenth Circuit Court of Appeals affirmed, noting that because the IEP was reasonably calculated to enable the student to make some progress, he had not been denied a FAPE. *Id.*

On appeal to the Supreme Court, the school district relied on *Rowley*, noting that it had provided access to instruction that was sufficient to confer some educational benefit and encouraged the Court to adopt a "some educational benefit" standard. *Id.* at 998. The Court declined, noting that in *Rowley* it had not been concerned with articulating a governing standard because the student was performing better than the average child in her class and advancing easily from grade to grade. The focus in *Rowley* was that the IDEA does not guarantee a particular level of education or promise any particular educational outcome. *Id.* In *Endrew F.*, the Court adopted a general standard, stating that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

The Court found that the IEP provisions reflect *Rowley*'s expectation that a FAPE will involve integration in the regular classroom as much as possible and individualized special education that is calculated to allow a student to advance from grade to grade. *Id.* It noted, however, that "[i]f that is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement" but "his educational program must be appropriately ambitious for most children in the regular classroom." *Id.* at 1000. The Court cautioned that the absence of a bright-line rule should not be mistaken for "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 1001 (citing *Rowley*, 458 U.S. at 206). It explained "deference is based on the application of expertise and the exercise of judgment

19

by school authorities" and "[a] reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable to the child to make progress appropriate in light of his circumstances." *Id.*

Defendants argue that under *Rowley*, school districts generally have discretion to determine the instructional method but must maintain an open dialogue with parents regarding the instruction. Defendants dispute that Brody's parents advocated for a specific reading curriculum at IEP team meetings, noting that the record is devoid of any evidence of such a request aside from Lisa Kass' testimony. Defendants maintain that a specific reading curriculum was requested only after the parents retained an attorney to attend meetings to discuss the IEP for the 2020-2021 school year.

As illustrated by *Rowley* and *Endrew F.*, the issue is not which reading methodology is best for Brody but whether the methodologies used by the District were "reasonably calculated to enable [him] to make progress in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 1001. The school used the PCI reading program for Brody during the 2018-2019 school year, which focused on learning sight words. An initial goal was set for Brody that by December 2018, he would recognize 140/140 words when given the PCI Level 2 Comprehensive Test Checklist. *See* Doc. 18-5 at 9. The October 2018 IEP indicated that Brody was able to recognize 77 words. *Id.* at 44. To measure his progress, Brody would be assessed on the Comprehensive Word Checklist every two weeks. *Id.* It indicated "[i]f four consecutive data points fall above or below the aim line, after 6 data points and weeks of initial instruction, the team will consider instructional changes." *Id. See also id.* at 51 (plotting progress in word list from November 2017 to November 2018 and showing an "aim" line and "trend" line for Brody's progress); *Id.* at 58 (providing a monitoring log for this goal showing Brody's score every two weeks).

There was never an opportunity to see if Brody progressed beyond 77 words because, in November 2018, the reading goal was changed to: "In 36 weeks, when

20

provided with standards based literacy instruction, Brody will demonstrate the ability to meet 25% (4 out of 16) of rubric standards as evidence[d] by Brody's actions and observation of the skills within a vocational, project based learning setting." *Id.* at 115. He was currently scoring 6% or 1 out of 16 on rubric standards. This change was based on an assessment and recommendations by the AEA. *See* Doc. 18-14 at 738-40; Doc. 18-15 at 125-26. This goal remained the same in the February 2019 IEP, at which point Brody had mastered 12 percent of rubric standards, according to the monitoring log. Doc. 18-5 at 190. Brody's reading goal remained the same in the September 2019 IEP and Brody's score increased to 31 percent. *Id.* at 234, 242. At this point, the IEP team discussed using Next Step Guided Reading instead of PCI. Doc. 18-14 at 112.

By October 2019, Brody had mastered 19 skills and scored 7 out of 16 on rubric standards for literacy based on the Iowa Core Standards. Doc. 18-5 at 306. The IEP team set a new goal for Brody to meet 12 out of 16 rubric standards in the next 36 weeks. *Id.* at 307. The school used the fall of 2019 to assess Brody and determine his placement in the Next Step Guided Reading program, which it began using in December 2019. Docs. 18-14 at 452-54; Doc. 18-15 at 87-88. The March 2020 IEP reflected the same reading scores and goals. Doc. 18-1 at 497-98. The May 2020 IEP eliminated a reading goal and focused on goals in the areas of 21st Century skills and adaptive behavior based on a reevaluation report by the AEA. *Id.* at 550-52.

Plaintiffs primarily take issue with the August 2018, November 2018 and May 2020 IEPs. Doc. 23 at 44. Again, the question is whether the methodologies used by the District were "reasonably calculated to enable [Brody] to make progress in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 1001. To summarize, the District employed two separate reading methodologies: PCI during the 2018-2019 school year and Next Step Guided Reading during the 2019-2020 school year. It is difficult to ascertain Brody's progress, as the IEP team shifted goals and methodologies during this time period based on the AEA's recommendations. Nonetheless, the record reflects that from November 2018 to March 2020, Brody progressed from meeting 6 percent (1 out

21

of 16) of rubric standards to 75 percent (12 out of 16) during the transition from PCI to Next Step Guided Reading, exceeding the initial goal of meeting 4 out of 16 rubric standards. *See* Doc. 18-1 at 506.

One of the relevant circumstances for Brody is his seizure activity. Johanns, a special education teacher, explained that Brody's reading goal was to master a certain number of standards and that they would teach Standard 1 until he mastered it, then move on to Standard 2 until he mastered that. Doc. 18-15 at 59-60. They would continue to progress through the standards because they wanted him to be exposed to all of them. However, she noted that if they went back to Standard 1 and retested Brody, he may not recall that information and they would have to redo it. She explained Brody required a lot of repetition because his seizure activity could cause him to regress for a day or two and could cause him to forget information he had learned earlier such that he would have to be retaught. *Id.* at 60-61. She noted that as long as he continued to progress towards new standards, they could go back and reteach earlier standards. *Id.* Nonetheless, she noted that Brody's reading assessments demonstrated he was making progress. *Id.*

When asked whether PCI was an appropriate program for Brody, Schafer – a school psychologist with the AEA – testified: "PCI could be one of the programs that would be very successful or could be very helpful for Brody. I have experienced more at the elementary level, not directly at the high school level, students with cognitive disabilities using the PCI curriculum and being successful." Doc. 18-15 at 160. She also explained that "based on the data that we collected, there was some inconsistency in his performance, and we felt that inconsistency was consistent with his cognitive functioning, could be explained partially because of cognitive functioning, but also due to some of the seizure activity that he experiences." *Id.* at 161. She summarized:

> Brody has had the opportunity to use and utilize several different reading programs, several different reading curriculum, and regardless of the program that was being used, the data indicates that his progress was limited and that the skills that he has still reflect his independence at a very early elementary reading age.

As far as grade-level equivalency, or that kind of thing, it could be very dependent on the specific program or the specific curriculum that you were talking to – or talking about because each program developer has its own way of determining what is a first-grade reading level, for example, and the content that's provided.

*Id.* at 161-62. Schafer recommended:

a shift from discrete instruction in the area of reading and more so embedding that literacy instruction into those post-secondary expectations and into more work experience kind of things, being able to provide instruction that's going to help Brody function in a work setting.

Again, because he was a senior at the time of this reevaluation, we always have to look forward to what's going to be happening with a student after they graduate from high school, and we felt it was going to be very appropriate and very important to really start looking at those functional reading skills.

*Id.* at 162-63.

With regard to the effectiveness of the PCI and Next Step curriculums generally, PCI is described as a:

scientifically research-based curriculum designed to help nonreaders become successful readers. Created specifically for students with developmental disabilities, autism, and significant learning disabilities, the three-level program incorporates high-frequency words and real-world words within a comprehensive program of instruction, practice, and assessment. Nonreaders of all ages become readers through a system of repetition, hands-on practice, errorless discrimination, controlled reading and high-interest activities.

Doc. 18-3 at 246. Next Step Guided Reading is described as:

small-group reading instruction designed to provide differentiated teaching that supports students in developing reading proficiency. The teacher uses a tightly structured framework that allows for the incorporation of several research-based approaches into a coordinated whole. For the student, the guided reading lesson means reading and talking (and sometimes writing) about an interesting and engaging variety of fiction and nonfiction texts. For the teacher, guided reading means taking the opportunity for careful

23

text selection and intention and intensive teaching of systems of strategic activity for proficient reading (Fountas & Pinnell, 1996).

After systematic assessment to determine their strengths and needs, students are grouped for efficient reading instruction. While individuals always vary, the students in the group are alike enough that they can be effectively taught in a group. Texts are selected from a collection arranged along a gradient of difficulty. The teacher selects a text that students will be able to process successfully with instruction.

Doc. 18-14 at 42. Both programs are based on and supported by research. *Id.* at 39-52. The District was also supplementing with other methodologies or programs including phonics, Start to Finish Reading, Triumphs, FastBridge, Iowa Core Standards worksheets and Basic Reading Series One. *See* Doc. 18-5 at 256-57.

I find that the reading methodologies used by the District were reasonably calculated to enable Brody to progress in light of his circumstances. Brody met and exceeded the reading goal set by the IEP team to meet 4 out of 16 rubric standards by reaching 12 out of 16 standards. He made progress under both the PCI and the Next Step curriculums. Plaintiffs specifically challenge the November 2018 IEP goal stating there was no reading goal and that continued use of PCI was inappropriate. Doc. 23 at 49. I disagree. The November 2018 IEP set the reading goal of meeting 25 percent (4 out of 16) rubric standards. Doc. 18-2 at 82. From November 2018 to February 2019, Brody increased from a score of 6 percent to a score of 12 percent. *Id.* at 183. Given that the goal was 25 percent, this is sufficient progress and demonstrates that the methodology was reasonably calculated to allow Brody to make progress. While other reading curriculums may have allowed Brody to progress further or more quickly in reading, the efficacy of those programs, as applied to Brody, is unknown, unlike the circumstances in *Endrew F.*

Plaintiffs argue Brody did not make progress because "it is impossible to determine what rubric standards Brody mastered and whether they had anything to do with reading." Doc. 23 at 51. They also argue the ALJ had no data to show Brody's progress in reading

prior to January 2019. *Id.* They assert that because Brody was reading at the kindergarten level when school started in the fall of 2018 and continued to read at the kindergarten level in May 2020, he did not make progress. However, progressing a grade-level in reading was not a goal in the IEP and is not a requirement of "progress" under the IDEA. *See Endrew F.*, 137 S. Ct. at 1000 (noting that if progression through the regular curriculum is "not a reasonable prospect for a child, his IEP need not aim for grade-level advancement."). Also, because the District changed Brody's reading goal in late 2018 based on recommendations of the AEA, there is little information in the record regarding his prior progress in reading. The reading goal set by the IEP team was to master rubric standards or Iowa Core Standards, which are set out in the October 2019 IEP and are clearly related to reading. Doc. 18-1 at 452. It was not necessary to include each of these standards in earlier IEPs, as they are Iowa Core Standards and thus could be easily confirmed by members of the IEP team. The record demonstrates that the District's reading methodologies were reasonably calculated to allow Brody to make progress (based on the goals set by the IEP team) in light of his circumstances.

Plaintiffs complain that the ALJ did not make a finding of fact as to whether PCI and Next Step were appropriate for Brody.[4] Doc. 23 at 32. Whether they are appropriate

---

[4] Plaintiff also argues the ALJ was required to make findings of fact as to:

- Whether the facts in the record support Coyle's testimony that PCI and Next Step were chosen because they are appropriate methodologies for Brody.
- Whether the facts in the record support Dr. Lemons' testimony that PCI and Next Step were not appropriate for Brody.
- Whether Brody's IEP teams concluded "over the years" PCI and Next Step were appropriate for Brody.
- Whether Brody's progress in learning to read was consistent with his abilities, conditions, level of cognitive functioning and prospect for progress.
- Whether the District's reading program was inadequate.
- Whether the goals in the IEPs were specially designed instruction and methodology consistent with the standard expressed in *Endrew F.*

is measured by the "reasonably calculated" legal standard set forth in *Endrew F.* There is no fact issue to be resolved as to which programs are "appropriate" because the legal issue is whether the programs used were reasonably calculated to enable Brody to make progress in light of his circumstances. It is immaterial whether the methodologies plaintiffs sought would also meet this standard and be considered "appropriate" so long as the District's methodologies met this standard.

Plaintiffs also take issue with the ALJ's statement that "[c]ourts should be disinclined to overturn a district's choice of appropriate educational theories." Doc. 23 at 33. They argue the ALJ turned *Rowley*'s statement that "courts must be careful to avoid imposing their views of preferable educational methods upon States," *Rowley*, 458 U.S. at 207, into an irrebuttable presumption that deference must be provided to a school district's choice. I disagree. The ALJ sufficiently articulated the correct standard. *See Rowley*, 458 U.S. at 207-08 (explaining that the IDEA gave primary responsibility to the state and local educational agencies in cooperation with the parents and guardian of the child to formulate the child's education and that "[i]n the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2)."); *see also Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008) ("*Rowley* sends a very clear message. The short of it is that courts are entrusted with ascertaining the adequacy of an IEP's educational components but not with weighing the comparative merit of the components when stacked against other heuristic methods.").

---

- Whether the District's witnesses each testified that PCI and Next Step were appropriate educational methods to teach Brody to read.
- Whether the record supported the conclusion that Brody made some progress in reading.

Doc. 23 at 34-35. Again, many of these are legal conclusions, which the ALJ articulated in his opinion. Other "findings" were unnecessary as they are not relevant to the applicable legal standard.

Plaintiffs assert that the science of reading is the only appropriate methodology to teach Brody reading and that the District did not sufficiently investigate whether its methodologies were appropriate. There appears to be no dispute that the science of reading methodology, as advocated by plaintiffs, would be appropriate, but that is not the issue. The issue concerns the school's selected methodologies, which must be reasonably calculated to allow Brody to make progress in light of his circumstances. Progress must be measured by the IEP goals and not plaintiffs' own definitions. *See* 20 U.S.C. § 1414(a)(1)(d)(1)(A)(i)(II) (requiring that an IEP include "a statement of measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum and . . . meet each of the child's other educational needs that result from the child's disability.").

In *Endrew F.*, the Supreme Court explained:

> The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue . . . . By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

*Endrew F.*, 137 S. Ct. at 1001-02. Here, the record supports the appropriateness of the school's methodologies:

- From November 2018 to February 2019, Brody progressed from meeting 6 percent of rubric standards to 12 percent using the PCI methodology (with the goal being to meet 25 percent of rubric standards (4 out of 16) by August 2019). Doc. 18-5 at 190.

- Brody exceeded the IEP goal by October 2019 using PCI by meeting 7 out of the 16 standards. *Id.* at 377.

27

- Schafer testified: "PCI could be one of the programs that would be very successful or could be very helpful for Brody. I have experienced more at the elementary level, not directly at the high school level, students with cognitive disabilities using the PCI curriculum and being successful." Doc. 18-15 at 160. Also: "With the experience that I've had for the last 16 years as a school psychologist, I have experience with students who have used PCI who have a significant cognitive disability and experienced success with that program." *Id.* at 181.

- Coyle testified that "[w]ith PCI, we kind of got to a certain point, and then we weren't seeing as much progress as we did prior, and so we decided to make a switch. And Next Step Guided Reading was chosen because of all the different components that it has with it and also because we were able to individualize instruction for Brody, so it has the assessed side guide framework. Doc. 18-14 at 818-20. She also testified the program allowed them to identify deficits and then tailor the instruction to those deficits. *Id.* It also had a phonics component. *Id.* at 820.

- At the end of 2019, after the school had been assessing Brody for Next Step Guided Reading and beginning instruction in December 2019, Brody had mastered 11 out of 16 rubric standards. Doc. 18-5 at 377.

- By March 2020, he had mastered 12 standards, meeting the IEP goal. *Id.*

While Dr. Lemons testified that PCI and Next Step were not what he would recommend because they were not currently aligned with evidence-based reading interventions for students with intellectual disability, Doc. 18-14 at 564, this is insufficient to deem those methodologies inappropriate. Plaintiffs' argument is similar to that made in *Lessard*, which the court rejected:

> In an effort to expand the scope of judicial intervention, the appellants resort to an esoteric definition of "appropriate educational theories," which they equate with theories that produce results. They do not contest that Stephanie was the beneficiary of a standard, multisensory reading methodology. Nevertheless, they argue that since Dr. Kemper concluded that Stephanie had progressed very little under that methodology, it was, a fortiori, "inappropriate."

28

This construct inverts the rule of decision. Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE. *See e.g.*, *Rowley*, 458 U.S. at 209-10; *Nack [ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d [604], 612 [(6th Cir. 2006)]; *see also Roland M. [v. Concord Sch. Committee]*, 910 F.2d [983], 991 [(1st Cir. 1990)] (explaining that "actual educational results are relevant to determining the efficacy of educators' policy choices."). But to impose the inverse of this rule – that a lack of progress necessarily betokens an IEP's inadequacy – would contradict the fundamental concept that "[a]n IEP is a snapshot, not a retrospective." *Roland M.*, 910 F.2d at 992. Where, as here, a school system develops an IEP component in reliance upon a widely-accepted methodology, an inquiring court ought not to condemn that methodology ex post merely because the disabled child's progress does not meet the parents' or the educators' expectations. *See Lachman v. Ill. St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988).

*Lessard*, 518 F.3d at 29. Similarly, plaintiffs' argument boils down to a position that their preferred methodology is the best way to teach Brody to read. This goes beyond what the IDEA requires. *See M.M. ex rel. C.M. v. School Bd. of Miami-Dade Cnty, Fla.*, 437 F.3d 1085, 1102 (11th Cir. 2006) ("The dispute in this case boils down to the parents' belief that AVT is the program best suited to provide C.M. with a quality education. However, under the IDEA there is no entitlement to the 'best program."). Under the applicable standard of review, the court does not weigh each side's preferred methodology and determine which is the best. I agree with the ALJ's legal conclusion that PCI and Next Step were reasonably calculated to allow Brody to make progress in light of his circumstances and, therefore, provided a FAPE.

## C. FAPE for the 2020-2021 School Year

### 1. Procedural Violation Regarding May 2020 IEP

Plaintiffs argue the District violated their procedural rights under the IDEA when it wrote the May 2020 IEP because the IEP team had not completed the substantive review that it concluded was necessary to write the IEP and did not wait for results of pending evaluations. Plaintiffs note the IEP team met on the following dates in 2020: January 16,

29

February 20, March 12,[5] May 29 and June 3. During the May meeting, they discussed a reevaluation report that had been requested by the team in March. Plaintiffs state that everyone involved agreed it was necessary to conduct a Functional Behavior Assessment (FBA). At the end of the June 3 meeting, plaintiffs argue the team discussed additional information that would be necessary to complete Brody's IEP. They contend they agreed to exchange information before setting up the next meeting and that plaintiffs' counsel would communicate with the District's counsel when they were ready for another meeting.

Plaintiffs argue the District's failure to convene the IEP team to complete the IEP resulted in significant information missing from the IEP that was necessary to formulate goals. Plaintiffs contend they were denied meaningful participation in the formulation of this IEP, particularly with regard to the reduction in Brody's school day. They argue the new schedule amounted to a change in educational placement and required the parents be provided a PWN with an explanation of the proposed action, which they never received. *See* 34 C.F.R. § 300.503. They assert that the District committed a procedural violation of the IDEA when it drafted the IEP with no meeting, which amounted to a denial of FAPE.

The District explains that the IEP team met in January and February. The family then requested a reevaluation, which took time to perform. Upon receipt of the reevaluation, the team met again in May and then June. The District states that the school team felt it had enough information and input from the parents to draft the IEP at that point. It sent the draft home to Brody's parents and stated that if they wanted an additional meeting based on the proposed plan in the IEP, they could request it. *See* Doc. 18-1 at 589. Plaintiffs did not request a meeting, but filed a due process complaint.

---

[5] This meeting was scheduled, but canceled due to plaintiffs requesting a reevaluation. However, Brody's mother and Coyle met to discuss extended school year (ESY) services. Doc. 18-5 at 414-15.

With regard to additional information and pending evaluations that the IEP team was waiting on, the District acknowledges that the parents requested an IEE. That evaluation was completed on July 31, 2020, and the report provided later and shared with the District. The District states it needed a plan in place to start the school year and that instead of requesting a meeting to discuss the results of the IEE, the parents filed due process, triggering stay put. The only other information it was waiting on was the FBA, which the parents knew and agreed could not be completed until Brody returned to school in the fall, as it required classroom observation that was not an option during the COVID-19 lockdown. *See* Doc. 18-5 at 462.

Not every procedural error results in the denial of FAPE. Rather, the procedural violation must: (a) impede the child's right to FAPE, (b) significantly impede the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child or (c) cause a deprivation of educational benefit. 34 C.F.R. § 300.513(a)(2). With regard to parents' meaningful opportunity to participate:

> The IDEA explicitly requires school districts to include the parents in the team that drafts the IEP, to consider the concerns of the parents for enhancing the education of their child, and to address information about the child provided to, or by, the parents. A school district cannot predetermine the educational program for a disabled student before meeting with parents. Such a predetermination could amount to a procedural flaw in the IEP because it could deprive parents of a meaningful opportunity to participate in the formulation process.

*M.M. v. Dist. 0001 Lancaster Cnty. Sch.*, 702 F.3d 479, 488 (8th Cir. 2012) (internal quotations and citations omitted). The school must provide parents an opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A).

I find no procedural violation here. Even if such a violation occurred, it did not result in the denial of FAPE. Plaintiffs participated in four IEP team meetings prior to the IEP being drafted and were given further opportunity to participate after the IEP was

31

drafted by requesting a meeting. *See* Doc. 18-1 at 589. The IDEA does not require the District and parents to agree on the education of a child with a disability. Rather, it requires "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child." 20 U.S.C. § 1415(b)(1); *see also A.W. ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 683 n. 10 (4th Cir. 2004) ("Although AW's parents indicated their dissatisfaction with AW's April IEP by declining to sign it, the right conferred by the IDEA on parents to participate in the formulation of their child's IEP does not constitute a veto power over the IEP team's decisions.").

Plaintiffs participated in four meetings prior to the May 2020 draft IEP. The IEP team met in January and February 2020, at which point Brody's parents requested a reevaluation. They met again on May 29, 2020, to review the Reevaluation Report and that meeting was continued to June 3, 2020, to continue reviewing the Report Doc. 18-1 at 547. Notes from the January and February 2020 meetings indicate that the school team noted Brody was on track to meet graduation credits, but that plaintiffs' attorney requested that Brody continue his education for the 2020-2021 school year. The team agreed there were unmet needs and that Brody would continue into the 2020-2021 school year. Doc. 18-1 at 521. It also indicated that a March 2020 meeting was canceled due to the parents' request for a reevaluation and that the IEP team would reconvene once the reevaluation was completed. *Id.* at 522. The PWN for the May 2020 IEP indicates: "The team agreed to complete a new FBA and update Brody's [behavior intervention plan] as necessary when school resumes in person" and "Parents have requested an IEE. The team is currently working through the process for arranging for the evaluation to take place." Doc. 18-1 at 590. It also states:

> The team agreed to perform an[] FBA and revise the BIP when school resumes because it was not able to be performed during the school closure.

32

The team needed to observe Brody in his instructional and work setting to observe his behavior in those settings. During the closure, the team could only observe his behavior via virtual means when Brody was at home with his parents.

*Id.* at 591; *see also* Doc. 18-11 at 31 (in an email to the District's attorney, plaintiffs' attorney wrote: "We recognize that the district cannot complete the evaluation during the school closure, which is likely to last through the end of the school year. My clients want to get this accomplished as soon as possible. We request that the district agree to a schedule for completing it, even if the schedule is contingent on the resumption of school.").

The PWN also took into account Brody's parents' request that Brody have core academic instruction in the areas of reading, writing and mathematics, noting that this request was rejected by the school team because the team believed focusing on functional skills for Brody in the community setting was more appropriate. Doc. 18-1 at 591. It states that the team based the proposed action on the reevaluation report, outside medical reports, school files, health plan, outside community partner reports, progress reports, parent and attorney input at IEP meetings, parent interview and observation of the student. *Id.* The PWN also notes the parents' request for an IEE. *Id.* The record indicates that evaluation was completed on July 31, 2020. Doc. 18-10 at 239-42. Finally, the reduced school day had been discussed by the IEP team as early as October 24, 2019. *See* Doc. 18-1 at 69 ("If Brody needed to come back to school in the fall, he would not go through graduation until the unmet skills are met. This would not be for a full day, but could be for a specified amount of time until his goals are met."); *see also id.* at 70 (listing schedule option with SDI and work in morning and then day hab/day care with transportation in the afternoon). As discussed in more detail below, the District determined that because Brody had completed all of the credits necessary for graduation, a reduced schedule was appropriate to address his unmet transitional needs. *Id.* at 548.

33

Plaintiffs were afforded a meaningful opportunity to participate in the four IEP team meetings in 2020. Their concerns were known and taken into account by the District in formulating the IEP. Doc. 18-1 at 544. Coyle testified the District was focused on functional and unmet transition needs and plaintiffs were focused on core academics, being in the school building all day and art and P.E. classes. Doc. 18-15 at 21. Additional information from the FBA could not be completed until Brody had started the school year. The IEE was not available after July 31, 2020, when the evaluation was completed. The District needed to have an IEP in place prior to the first day of school on August 22, 2020. As such, it sent the IEP to plaintiffs on July 15, 2020, and invited them to request a meeting if there were any issues. Plaintiffs did not request a meeting but instead filed a due process complaint the day before school started. While Coyle admitted there was never an IEP team meeting at which all IEP team members agreed on a reduced schedule, Doc. 18-15 at 19, it had been in the IEP documents as early as October 2019 and was discussed in later IEP meetings. *See* Exhibit 52 (audio of June 3, 2020 meeting).

Given that (1) there were four IEP team meetings prior to the release of the May 2020 IEP, (2) the parents' concerns were known and considered by the District and (3) the District did not include anything in the IEP that had not previously been communicated to the parents, I find there was no procedural violation. To the extent there could be a procedural violation based on these circumstances, I find it did not significantly impede the parents' opportunity to participate in the decision-making process and result in the denial of a FAPE.

## 2. *Transition Services*

Plaintiffs argue the District failed to provide, as part of Brody's transition services, a coordinated set of activities designed to be a results-oriented process focused on improving Brody's achievement. They assert the District should have assessed Brody's needs to secure employment as well as his preferences and then obtained a functional

34

vocational assessment. They argue that the IEP team should have then evaluated what employment expectations were attainable and determined the skills needed.

The District argues that it is in Brody's best interest to provide him services to meet his unmet transition needs prior to graduation. It notes the IEP provides him instruction in his areas of need in the classroom and community setting and provides additional work experiences in the community with a job coach. The District also coordinated with the Iowa Vocational Rehabilitation Services (IVRS) to provide an additional hour per day with him in the work setting. IVRS and Brody's case manager spoke at an IEP meeting about all the services that are available to Brody in the community. *See* Doc. 18-10 at 416. The District argues the May 2020 IEP addresses Brody's unmet transition needs. It provides instruction to help him function in the community as well as goals directed at skills in social interaction, behavior, independent living and employability. The ALJ concluded:

> A review of this record shows that the District and the IEP team put great thought and discussion into the student's transition needs. It provided the student an informed comprehensive set of services and opportunities. The student's IEPs contained appropriately ambitious and reasonable goals, all of which were measurable and age appropriate. The goals and services evolved over time based on his growth, needs, and interest. The District took into account parental input, and it took into account the student's desires about what he wanted his future to look like. Data was derived from his work activities and reflected progress and growth toward his goals. Accordingly, I conclude that any allegation that the District failed to provide FAPE with regard to the student's transition services is without merit, and is therefore rejected.

Doc. 18-15 at 265-66.

The IDEA requires that when a student turns 16, the IEP include: "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" and "the transition services (including courses of study) needed to assist the child

in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). Transition services under the IDEA means "a coordinated set of activities for a child with a disability that:"

> (A)     is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B)     is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C)     includes instruction, relation services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(34); *see also* 34 C.F.R. § 300.320(b) (noting a transition IEP "must include appropriate measurable secondary goals . . . related to training, education, and employment . . . [and] transition services (including courses of study) needed to assist the child in reaching those goals.").

The May 2020 IEP described Brody's post-secondary expectations as follows: "Brody will get a hands-on type job in the community with job coach support as well as support from [vocational rehabilitation]. Due to Brody's seizures, visual impairment, and intellectual disability, Brody will always need assistance for his employment." Doc. 18-1 at 549. The IEP states:

> In an April 8, 2020 interview and April 15, 2020 report provided by Jamie Phipps, VR-IA Dept of the Blind, Brody works with a job coach one on one. He has a set schedule each day and he follows his schedule with the assistance of the job coach. Brody practices going to work on time, following instructions, taking appropriate breaks, and interacting appropriately with coworkers[.] Brody completes 1-2 step tasks with ongoing instruction throughout the shift. This was set up for Brody as he requires 1:1 instruction and consistent prompting to continue to work. Brody needs to know what is next so a regular schedule is important to

36

ensure success. Brody can get distracted easily, therefore a job coach is necessary. Brody needs to see an end result of his work so if it is a job that doesn't show him this, he will stop working and become frustrated. She stated that an Interest Inventory was conducted, Career Index Plus, and observations to determine that Brody's goal is to work in Production. With this assessment it was determined that Brody will need a job coach and he should have a job with no more than a 1 step task and be repetitious. The 8/18/18 IEP stated that Brody is very task oriented and works well until his job is finished.

Doc. 18-1 at 548.

The IEP contains three goals: one focused on employability skills and two focused on adaptive behavior. *Id.* at 550-52. Brody's employability skills goal is described as:

By May 2021, during community and work experiences, Brody will increase his endurance to be able to participate and complete expected tasks for 60 minutes with adult assistance and no more than one 10 minute break in at least 80% of opportunities without a behavior incident that results in needing to leave early or quit working.

*Id.* at 550. Brody was currently able to stay engaged for only 8 minutes before wanting to leave early, quit working or needing prompting to continue with a task. Progress for the new goal would be measured through a daily work log completed by his job coach that would measure the amount of time Brody was able to stay engaged and complete tasks. The IEP graph would document the amount of time he worked in a 60-minute work experience. *Id.*

The first behavior goal is: "By May 2021, during classroom activities and community experiences, Brody will use his math and reading skills with assistance to make purchasing decisions, complete transactions and navigate community settings while demonstrating appropriate social interaction skills with the adults." Doc. 18-1 at 551. Progress would be monitored through completion of an adaptive behavior skills chart that tracks his level of independence with the following skills: appropriate interaction with adults; reading packaging for preferred items, simplified menus and order boards; determining the needed amount of supplies and/or money; completing necessary money

37

transactions; responding to initiations and advocating for himself. *Id.* Each opportunity would be rated on a scale of 0 to 3 with 3 being the highest score (using a visual cue and/or no more than 1-2 verbal prompts form an adult). His total score would be determined every week and divided by the possible number of points to obtain a percentage. *Id.*

Brody's second behavior goal is: "By May 2021, after co-developing the schedule for a week and visual routines for common activities, Brody will utilize his schedule and routines to complete his arrival routine (at school or work) with up to 2 minutes of think time with no more than 1-2 verbal prompts." Doc. 18-1 at 552. It would be measured by tallying the number of prompts needed after giving Brody his needed think time of 2 minutes during each arrival routine. The median number of prompts would be graphed every 2 weeks. *Id.*

Plaintiffs contend the three IEP goals in the May 2020 IEP were not post-secondary goals because they were to be accomplished by May 2021, even though Brody would remain eligible for an IEP until the end of the 2021-2022 school year. *See* Iowa Code § 256B.2(1)(a). However, I find these goals meet the requirements of "transition services" under the IDEA. One of plaintiffs' specific complaints is that the May 2020 IEP does not summarize Brody's unique needs for his post-secondary education, employment, and goals in an organized, understandable manner. I disagree. In each category of living, learning and working, the IEP identifies Brody's areas of need. For instance, in the living category, the areas of need are:

> Brody needs adult guidance and support to complete the following: determine amounts needed to purchase items, complete needed transactions (including count $1 and $5 bills to match the amount needed), and using a calculator to complete mathematical operations.

> Brody will work on his social interaction skills and advocacy skills during classroom activities, community outings and at work. This will include responding to initiations from adults and asking for help or clarification as needed, create a work/activity/appointments/holidays/etc. calendar,

38

> community mobility skills, food preparation, housekeeping skills,
> community social/behavior skills, shopping skills, and safety skills.

Doc. 18-1 at 546. For learning, his area of need describes using reading and math skills for opportunities that he will encounter every day when on the job site, out in the community or with family. *Id.* at 547. His working area of need is described as needing adult guidance and support. He also needs a regular schedule and needs to know the end result of his work or he will get distracted or stop working and become frustrated. *Id.* at 548. Plaintiffs focus on statements in other areas of the IEP to argue that it does not summarize Brody's needs in an organized and understandable manner. When considering the context of those other statements, the IEP is consistent and organized.

Plaintiffs also allege that the IEP team did not describe the employment skills Brody needs to secure through transition services and instead focuses on a vast range of skills. They further argue that the District did not secure a functional vocational assessment under § 300.43(a)(2)(v)[6] and therefore could not identify Brody's specific job needs or suitable jobs. Again, the plaintiffs take portions of the IEP out of context in support of their argument. The "vast range" of skills that they reference are identified as Brody's areas of need in the "living" category, not "working." The plan of action for the "working" category identifies nine actions, but plaintiffs are incorrect that none are incorporated into measurable goals. The nine actions include:

> job exploration, Voc. Rehab counseling, work-based learning experiences
> (skills learned while at work experience site), instruction in self-advocacy
> (be able to communicate his needs while at the job site), workplace
> readiness training (interacts with co-workers appropriately, demonstrated
> attention to detail, ability to work independently – taken from the work
> assessment provided by the SCL worker), financial literacy skills
> (demonstrates understanding why he gets and needs a paycheck), job
> seeking skills with assistance (applying for a job, planning for an interview,

---

[6] Providing that transition services are based on the individual child's needs and "[i]f appropriate" includes "acquisition of daily living skills and provision of a functional vocational evaluation." 34 C.F.R. § 300.43(a)(2)(v).

and use appropriate communication skills), communication (greeting co-workers, ask an employer about tasks, communicating his needs with adult support) and independent living skills.

Doc. 18-1 at 547. The IEP indicates that the special education and VR-IA Department of the Blind would be collaborating on different post-secondary options including the above actions. Many of these actions are reflected in the above-identified employment and behavior goals and how they would be measured. While the IEP does not specifically provide for a functional vocational assessment, Brody had already completed a work assessment with the SCL worker. Additionally, in the June 3, 2020, meeting, the IEP team discussed steps toward completing a functional employment assessment, including contacting the appropriate organization and obtaining a possible timeframe for completion. *See* Exhibit 52. In any event, it is not a required transition service. *See* 34 C.F.R. § 300.43(a)(2)(v).

Plaintiffs also complain that Brody's IEP goals are inadequate to meet his needs and that the SDI is not focused on his goals. With regard to the IEP goals, they note the rubric to monitor progress toward the adaptive behavior goal provides no information for how and when points should be awarded and covers many behaviors when the goal is only completing purchases. *See* Doc. 18-1 at 551 (describing the first behavior goal as: "By May 2021, during classroom activities and community experiences, Brody will use his math and reading skills with assistance to make purchasing decisions, complete transactions and navigate community settings while demonstrating appropriate social interaction skills with the adults."). They also argue there is no performance criteria for the categories such that the progress monitoring is totally subjective. *Id.* (identifying categories as: appropriate interaction with adults, reading packaging for preferred items, simplified menus and order boards, determining the needed amount of supplies and/or money, completing necessary money transactions, responding to initiations and advocating for himself).

With regard to the SDI, they argue it is too broad and does not amount to coordinated activities within a results-oriented process. The SDI for Brody's adaptive behavior goal is described as follows:

> Brody will receive individualized instruction on functional math, reading and writing skills that will help him complete activities in his classroom, community, and work settings. These will include: reading packaging, simplified menus and order boards, recipes and directions, determine amounts needed (supplies and/or money), complete needed transactions (including counting $1 and $5 bills to match the amount needed), using a calculator to complete mathematical operations and navigating community settings by reading the signs.
>
> Brody will work on his social interaction skills, independent living skills, and advocacy skills during classroom activities, community outings and at work. This will include responding to initiations from adults and asking for help or clarification as needed.
>
> In addition, Brody will practice a variety of work tasks in the classroom setting that could be possible future jobs or activities in the community/work setting. He will be taught to follow visual routines for multiple-step tasks and these will be transferred into the community/work setting to support his efforts. Brody's endurance for task completion will be worked on by systematically increasing the expectations for work and reinforce these efforts with access to preferred activities.

Doc. 18-5 at 435. The SDI for employability is described as:

> Brody will have regular opportunities to participate in community outings. These will include trips to stores, restaurants, gas stations, the library, and other community locations as available. Brody will practice his social interaction skills, math skills and literacy skills in the classroom and during these visits while supported by an adult to reduce his frustration and refusal behaviors. His community outings will be dependent on Brody's regulation.

*Id.*

The IEP goals are adequate to meet Brody's post-secondary needs as identified in the IEP. As described above, the IEP lists Brody's needs in the areas of living, learning and working. The IEP goals adequately address these needs. For instance, in the living

41

category, the IEP identifies a need of adult guidance and support to complete transactions and development of social interaction and advocacy skills. Doc. 18-1 at 546. In the learning category, the IEP identifies a need of using reading and math skills for opportunities that he will encounter every day when on the job site, out in the community or with family. *Id.* at 547. One of his behavior IEP goals is: "By May 2021, during classroom activities and community experiences, Brody will use his math and reading skills with assistance to make purchasing decisions, complete transactions and navigate community settings while demonstrating appropriate social interaction skills with the adults." Doc. 18-1 at 551. This addresses both of those needs. Brody's working needs also include adult guidance and support, as well as a regular schedule and knowing the end result of his work to prevent distractions or stopping work. *Id.* at 548.

> Brody's employability skills goal is:

> By May 2021, during community and work experiences, Brody will increase his endurance to be able to participate and complete expected tasks for 60 minutes with adult assistance and no more than one 10 minute break in at least 80% of opportunities without a behavior incident that results in needing to leave early or quit working.

*Id.* at 550. Brody's other behavior goal is focused on using his schedule and routines to complete an arrival routine at school or work with up to two minutes of think time and no more than 1-2 verbal prompts. *Id.* at 552. This also addresses his need for adult guidance and support with work as well as predictability in his day. Plaintiffs essentially disagree with the identified needs and goals in the May 2020 IEP, but that does not mean it denies Brody a FAPE.

With regard to the rubric to measure progress and performance criteria for the adaptive behavior goal involving the use of math and reading skills to make purchasing decisions, the IEP describes the progress monitoring procedures as follows:

> Progress will be monitored through completion of the adaptive behavior skills chart that tracks his level of independence with these skills: appropriate interaction with adults, reading packaging for preferred items, simplified menus and order boards, determining the needed amount of

> supplies and/or money, completing necessary money transactions, responding to initiations and advocating for himself. Each opportunity will be rated on a scale of 0 to 3 with 3 being the highest score (using a visual cue and/or no more than 1-2 verbal prompts from an adult). His total scores will be determined ever week and divided by the possible number of points to obtain a percentage.

Doc. 18-5 at 427. This rubric adequately explains how and when points should be awarded. It involves some subjectivity but also incorporates objective measurements, such as whether Brody used a visual cue or required a verbal prompt from an adult to complete the task. While it covers multiple skills, they are all related to and relevant to the goal that extends beyond merely making purchasing decisions. Rather, the goal is for Brody to "use his math and reading skills with assistance to make purchasing decisions, complete transactions and navigate community settings while demonstrating appropriate social interaction skills with adults." *Id.* The rubric is sufficient to measure progress toward the stated goal.

With regard to the SDI, I find it is tailored to the three IEP goals and describes a coordinated set of services designed within a results-oriented process. The results, and how they are to be measured, are described within the IEP goals. While broad, the SDI allows for a range of activities and experiences for Brody to work towards his IEP goals, which in turn, are based on the broad post-secondary goal of getting a hands-on type job in the community with job coach support. The definition of transition services under the IDEA embraces this broad approach: *See* 20 U.S.C. § 1401(34)(C) (noting that the coordinated set of activities "includes instruction, relation services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation."); *see also Candi M. v. Riesel Indep. Sch. Dist.*, 379 F. Supp. 3d 570, 591 (W.D. Tex. 2019) (noting that 20 U.S.C. § 1414 does not set forth specific criteria for the measurability of postsecondary goals, but the statutory mandate is guided by the overarching purpose of the IDEA to ensure that all children with disabilities have

access to a FAPE that prepares them for further education, employment and independent living); *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 574 (E.D. Pa. 2013) ("While a school district must provide opportunities for a disabled student to build independent living skills and explore a post-secondary educational or vocational plan, courts in the Third Circuit have emphasized that these requirements are undemanding and are focused more on exposure to opportunities than a promise of a particular outcome."). The SDI, as described in the IEP, fulfills the requirements for transition services under the IDEA.

Finally, plaintiffs complain that the District denies Brody a FAPE by leaving him with unscheduled time for afternoon education activities and offering transportation to home, "day hab" or day care. They note the IEP does not specify what vocational rehabilitation will do beyond stating: "Voc Rehab will work with Brody for additional work experience with a job coach, job shadowing, and additional work assessments. Voc. Rehab has also indicated they are willing to provide one hour of work experience per day along with transportation to and from work." Doc. 18-1 at 565. The District's position is that Brody needs to start making connections in the real-world setting because that is where he will be when he ages out of special education services. The District brought in IVRS to speak at an IEP meeting about the services that are available to Brody in the community that will address his unmet transition needs and help start making the transition for Brody.

As discussed in greater detail below, the shortened school day was based on Brody having met all graduation requirements. A shortened school day does not violate the IDEA if the IEP team determines that a shortened school day is "specially designed to meet a child's unique needs." *Endrew F.*, 137 S. Ct. at 999 (cleaned up). Because Brody had unmet transitional needs only in the areas of employability and adaptive behavior, a full school day was unnecessary. Indeed, the parents' request for a full day of school was based on their request for continued instruction in core academics (such as reading and math) and other general education courses (such as P.E. and art). The District

44

rejected that request based on Brody having completed all course requirements and having unmet needs in transition services. The IEP goals, SDI and progress measuring for those needs complies with the IDEA. There was no denial of a FAPE based on the nature of the transition services described in the May 2020 IEP.

### 3.    Reduction in Brody's School Day

Plaintiffs argue that Brody is entitled to the same length of school day as all other students, *see* 20 U.S.C. § 1412(a)(5)(A),[7] and that to reduce his school day for reasons other than to meet his educational needs is not permitted. They argue the ALJ failed to make any findings of fact on the issue or consider whether the IEP team concluded that a shortened school day was necessary to meet Brody's educational needs. Plaintiffs' arguments circle back to arguments that Brody needed to learn to read and needed to be in general education classes, including art and P.E., and to have lunch with peers to develop his social skills. They note the PWN failed to explain reasons for the reduced school day, except to state that Brody needed to focus on functional skills and that he had already completed the courses necessary for graduation. Plaintiffs assert that because the decision to shorten Brody's school day was not agreed on by the IEP team, the District denied him a FAPE.

The District argues that Brody has already earned his required credits to graduate. It distinguishes cases cited by plaintiffs by noting that the school districts in those cases unilaterally shortened school days. It notes that it is up to the IEP team to determine what the needs of a student are and what services are required to meet those needs. Here,

---

[7] Describing the least restrictive environment requirement as: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

45

the IEP team agreed Brody has unmet transitional needs. It contends the IEP goals were reasonably calculated to provide educational benefits.

The May 2020 IEP proposed the following schedule for consideration:

8:00-10:00 SDI at school or in the community
10:00-10:15 Travel to work (Theisens)
10:15-11:15 Work with job coach from school at job site (Theisens)
11:15 Transportation provided by school to home/day hab/day care

Doc. 18-1 at 566. It also stated that "Voc Rehab will work with Brody for additional work experience with a job coach, job shadowing, and additional work assessments. Voc. Rehab has also indicated they are willing to provide one hour of work experience per day along with transportation to and from work." *Id.* The ALJ reasoned:

the student has already accumulated sufficient credits in all of these various areas to have met his graduation requirements. The subsequent decision to focus on transition needs partly in a school setting and partly in the community, for half of the day, was a decision made by the IEP team based on the student's unique needs and situation. This is not the case where the school made a unilateral decision or there was some general edict where students with enough credits to graduate may not spend a full day in school. Rather, this decision was made by the IEP team based on an individualized decision of the student's needs, that is to say, his unmet transition needs. Complainants cite no regulation or case standing for the proposition that a student with only certain non-graduation requirements remaining is entitled to a full day of general education classes.

Doc. 18-15 at 267.

This issue reflects a fundamental disagreement between the District and plaintiffs regarding Brody's educational needs. Plaintiffs argue Brody continues to need instruction in reading and math and would benefit from other general education classes and experiences such as art, P.E., sex education and lunch, in addition to transition services. They contend these educational needs cannot be fulfilled in a reduced school day. The District argues Brody has completed all of his general education requirements and a reduced school day is all that is necessary to address his unmet needs, which are limited to transition services related to employability and adaptive behavior. The PWN explains

46

the District's reasons for rejecting the parents' requests for instruction in core academics as well as art, P.E., sex education and lunch at the school. Doc. 18-1 at 590-91. Part of its reasoning was based on the Reevaluation Report. *See* Doc. 18-2 at 270-312. With regard to English language arts (reading), the reevaluation team recommended:

> A shift in focus from isolated literacy skills (phonics, decoding, sight words, vocabulary) to embedding these skills into opportunities that Brody will encounter every day. When on the job site, when out in the community or with family, embedding literacy into his routines, this could be done by the special education teacher and/or through accessing post secondary service providers (IVRS, SCL, LTSS, etc.) Brody needs adult guidance and support to use those skills he has gained and/or tools he has access to and transfer them into his day to day activities outside the school setting.

*Id.* at 289. In math, it recommended:

> Similar to the Language Arts recommendations, the team recommends shifting away from isolated skill instruction in basic addition and subtraction for Brody and instead, should focus on functional math skills; embedding these skills into opportunities that Brody will encounter every day. When on the job site, when out in the community or with family, embedding mathematics into his routines could be done by a special education teacher and/or through accessing post secondary service providers (IVRS, SCL, LTSS, etc.). Brody needs adult guidance and support to use those skills and tools he has been introduced to (examples include: using a calculator, using a checkbook/checking account, basic money, and concepts of time) to be utilized during his post secondary experiences. Relating all of these skills to real life will allow him to generalize those skills into his daily activities. This should be provided outside of the school building and into Brody's community interactions.

*Id.* at 292.

The reevaluation team recommended that an adaptive behavior goal be considered for education beyond Brody's senior year. *Id.* at 293. It also relied on information provided by Phipps at the February 2020 IEP meeting with regard to vocational recommendations. *Id.* at 294. It concluded that no academic goals were recommended at the time and recommended the IEP gradually transition Brody to more natural experiences in the community. *Id.* at 312. The IEE obtained by plaintiffs also

47

recommended a focus on functional education "such as reading instructions, completing applications, making a grocery list and tallying the total amount of money needed to purchase the items on the list with his calculator." Doc. 18-2 at 315. Millice, who performed the evaluation, also found Brody could make use of additional time at school to learn and practice additional reading of functional words such as safety words, warnings, signs in the environment, and words he may encounter on the job. *Id.* She emphasized the importance of providing education for his unmet needs so that he can successfully transition to the world of work and adulthood. *Id.* at 316. All of these sources support the District's decision to reduce Brody's school day based on his fulfilled general education credits and unmet needs in transition services.

To the extent plaintiffs assert they were not aware the District was considering a reduced schedule, the record indicates otherwise. The reduced school day was discussed in IEP team materials as early as October 24, 2019. *See* Doc. 18-1 at 69 ("If Brody needed to come back to school in the fall, he would not go through graduation until the unmet skills are met. This would not be for a full day, but could be for a specified amount of time until his goals are met."); *see also id.* at 70 (listing schedule option with SDI and work in morning and then day hab/day care with transportation in the afternoon). Exhibit 52, a recording of the June 3, 2020, IEP meeting, reflects that the IEP team extensively discussed the reduced schedule as well as plaintiffs' concerns[8] and the District's reasons for that schedule. While plaintiffs may disagree with the District's approach, plaintiffs had an opportunity to provide their input in the four meetings leading up to the May 2020 IEP. The record indicates that the District took plaintiffs' request into account, but ultimately determined that the reduced schedule was sufficient to address Brody's unmet transition needs and provided a reasonable explanation of its decision to

---

[8] Specifically, plaintiffs requested that Brody return to school in the afternoon and that he be taught a different reading program, such as Orton-Gillingham, as well as math, P.E. and art. *See* Exhibit 52.

the plaintiffs, which is supported by the Reevaluation Report. The reduced school day provided in the May 2020 IEP does not deny Brody a FAPE.

### D.    Remaining Claim

Plaintiffs failed to address their claim under the ADA and Section 504 (Count II) in their merits brief. Defendants argue it should be dismissed because it was never raised at the administrative level, has been waived as a result of failing to brief it and fails for the same reasons as the IDEA claim as it relies on the same allegations. In *Ind. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996), the student and her parents requested an administrative hearing under the IDEA based on the school's refusal to reimburse S.D. for private school tuition. *Id.* at 558. The hearing review officer granted S.D. relief and the school district sought judicial review in federal court, at which point S.D asserted counterclaims and cross-claims under state and federal laws. *Id.* The district court granted judgment on the administrative record in favor of the school district, finding it had substantially complied with IDEA's procedural requirements and provided S.D. a FAPE. *Id.* It dismissed the remaining claims as precluded by the judgment. *Id.* The Eighth Circuit affirmed on appeal, finding that the non-IDEA claims were precluded by the IDEA judgment in the school district's favor. *Id.* at 562.

I find that plaintiffs' remaining claim of violations of the ADA and Section 504 (Count II) are precluded by resolution of the IDEA claim on judicial review. "Title II of the ADA prohibits public entities from discriminating based on disability in services, programs, or activities," while "Section 504 of the Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *I.Z.M.*, 863 F.3d at 972 (citing 42 U.S.C. § 12132 and 29 U.S.C. § 794(a)). The ADA and Section 504 claim requires that a plaintiff show more than a mere violation of the IDEA. *See Monahan v. State of Neb.*, 687 F.2d 1164, 1170 (8th Cir. 1982) (noting the

49

language of Section 504 prohibits exclusion, denial of benefits, and discrimination "solely by reason of . . . handicap" and that in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide a FAPE must be shown); *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 930 (8th Cir. 1994) ("Enforcement remedies, procedures and rights under Title II are the same as under section 504."). Preclusion applies if "resolution of the IDEA claims necessarily resolved" the non-IDEA claims. *I.Z.M.*, 863 F.3d at 972 (quoting *S.D.*, 88 F.3d at 562). If a student's Section 504 and ADA claims of unlawful discrimination are "wholly unrelated to the IEP process" they are not precluded. *Id.* (quoting *M.P. ex re. K & D.P. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865, 868 (8th Cir. 2006)).

In *I.Z.M.*, the Eighth Circuit found that the student's Section 504 and ADA claims were precluded because they "all grew out of or were intertwined with allegations that the District failed to properly implement his IEP, allegations that were necessarily resolved in rejecting his IDEA claims." *Id.* at 973. Even if not precluded, the claims failed as a matter of law because plaintiffs did not demonstrate a genuine issue of material fact that school officials acted in bad faith or with gross misjudgment. *Id.* (citing *B.M. ex rel. Miller v. South Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013)).

For Count II, alleging violations of the ADA and Section 504, plaintiffs allege:

> The District's practices and policies intentionally discriminate against Brody on account of his disabilities in a grossly negligent and intentionally discriminatory manner in violation of the ADA, 42 U.S.C. § 12101; and its implementing regulations and Section 504 of the Rehabilitation Act of 1973; 29 U.S.C. § 794 and its implementing regulations.

Doc. 1 at ¶ 71. They do not include any separate factual allegations related to this claim or otherwise detailing any alleged discrimination, but rely on the same allegations that form the basis of their IDEA claim. Because the ADA and Section 504 claim is subject to a more demanding standard and is intertwined with plaintiffs' allegations that the District did not follow the proper procedures under the IDEA and substantively violated

Brody's right to a FAPE, these claims are precluded by resolution of the IDEA claim and must be dismissed.

## V. CONCLUSION

For the reasons stated herein:

1.     Plaintiffs' appeal (Doc. 38) of the magistrate judge's decision (Doc. 33) denying their motion for leave to supplement the agency record is **denied**.

2.     The ALJ's decision is **affirmed** with respect to plaintiffs' IDEA claim (Count I) and plaintiffs' remaining claim (Count II) is hereby **dismissed**.

3.     Judgment **shall enter** in favor of defendants and against plaintiffs.

**IT IS SO ORDERED.**

**DATED** this 3rd day of November, 2022.

_____
Leonard T. Strand, Chief Judge